IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMILAH WAY,<br>  Plaintiff,<br><br>v.<br><br>CITY OF MISSOURI CITY,<br><br>  Defendants. | § § § § § § § § § § | CIVIL A. NO. <u>**4:22-cv-539**</u> |

## PLAINTIFF JAMILAH WAY'S FIRST AMENDED OORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff Jamilah Way files this First Amended Complaint and Jury Demand against Defendant City of Missouri City.

The City fired Way shortly after she returned from FMLA after surgery. The City claims it eliminated Way's position, however, the City's own records will show there was no such elimination.

A jury will find that the City fired Way because of her disability, request for accommodation, and because she took FMLA leave. In support, Plaintiff shows the following:

### I. <u>PARTIES, JURISDICTION, AND VENUE</u>

1. Plaintiff Jamilah Way is an individual who resides in Harris County, Texas.

2. Defendant City of Missouri City is a municipality in the State of Texas. The City operates an office located at 1522 Texas Pkwy., Missouri City, Texas 77489. The City can be served by serving its Mayor, Robin J. Elackatt, at 1522 Texas Pkwy., Missouri City, Texas 77489.

3. The Defendant is an employer within the meaning of the Americans with Disabilities Act Amendments Act, Texas Labor Code, and Family and Medical Leave Act.

4. This Court has jurisdiction to hear the merits of the claims under 28 U.S.C. § 1331.

5. This Court has supplemental jurisdiction to hear the merits of state claims pursuant to 28 U.S.C. § 1367, these claims being so related to the claims in the action within this Court's original jurisdiction that they form part of the same case or controversy.

6. Venue is proper in the district and division under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in Fort Bend County.

## II. FACTUAL BACKGROUND

**A. Missouri City hired Way to work as First Assistant City Attorney.**

7. Missouri City hired Way to serve as the First Assistant City Attorney in its City Attorney's Office, on August 20, 2018.

8. Way arrived at Missouri City after working for the City Attorney's Office in Dallas. With this new position, Way expected a long career with Missouri City and always gave her best efforts.

9. While working at Missouri City, Way experienced serious health complications.

**B. Way suffers from anxiety and suffered from disorders of her uterus and fallopian tubes. These disorders necessitated surgery to remove Way's cervix, uterus, and fallopian tubes.**

10. Way suffers from anxiety and suffered from disorders of her uterus and fallopian tubes. In particular, she suffered from severe uterine "fibroids."[1] Ultimately, her reproductive condition required a total hysterectomy, with surgical removal of her cervix, uterus, and fallopian tubes.

11. Way's disability first resulted in the need for accommodations under the ADA. Eventually,

---

[1] Ultimately, when they performed the pathology on the mass that was removed, they learned that Way had an extremely rare smooth muscle tumor of uncertain malignant potential, which resulted in a total hysterectomy.

her disability required that she take leave under the FMLA.

12. Because of her disabilities, Missouri City discriminated and retaliated against Way, and ultimately terminated her employment.

13. Missouri City made it clear, early on, that Way's disabilities resulted in animus toward her.

**C. City Attorney E. Joyce Iyamu began to target Way in response to her need for accommodation under the ADA. Iyamu disregarded Way's communications regarding matters that exacerbated her anxiety, began questioning Way's time when she knew Way was at doctors' appointments, prohibited Way from communicating with others necessary to perform her job, and would not allow Way to flex her schedule despite the fact that the attorneys regularly worked late hours.**

14. On August 14, 2019, Way informed her direct supervisor and superior, City Attorney E. Joyce Iyamu, that she was suffering from anxiety and seeking medical treatment for it.

15. On August 15, 2019, Iyamu and Way met to discuss some of the working conditions that exacerbated her anxiety, and Way expressed that she felt like she was treated differently.

16. Then, on or about September 23, 2019, feeling ill and experiencing severe pelvic floor spasms, Way notified Iyamu of her need to go to the hospital. Way went to the emergency room.

17. Iyamu called Way, while Way was on her way to the emergency room, and asked her why she had not gone to her doctor's office rather than the emergency room.

18. Iyamu was so displeased by Way's medical emergency that on September 23, 2019, the day Way went to the hospital, she listed Way's need to leave work for the hospital as an issue on the private notes that she maintained.

19. The following day, after Way had been released from the hospital, Iyamu directed Way to inform her of her arrival at the office.

20. Iyamu, in a meeting with Way, proceeded to inappropriately, and in the presence of Office Manager Kimberly Thomas, question Way about her medical treatment and diagnosis.

21. On the morning of September 25, 2019, Way's gynecologist was able to see her for a needed

follow-up after Way's visit to the emergency room. Way informed Iyamu of her docor's appointment, and told Iyamu that she would be in the office that day before 10:00 a.m.

22. On September 27, 2019, for the first time, after Way's medical emergency, Iyamu sent Way an email questioning her timeliness at work, implying that it was an issue, and was clearly not pleased with Way's absence. Iyamu's treatment towards Way is the reason why Way was scared to ask for a couple of days off to recover.

23. In October 2019, Way informed Iyamu of plans to skip lunch for two days so that Way could leave early for additional doctor's appointments.

24. For the first time, Iyamu required that Way provide a doctor's note, and implied that Way would be late or had failed to work enough hours. But, Way had not mentioned being late to work, and Way regularly worked late hours, exceeding weekly expectations.

25. On both November 8, 2019 and November 18, 2019, Way went to Director of Human Resources Martin Russell and complained of Iyamu's behavior toward her, including Iyamu's discrimination against her.

26. The City brought in Kim Harris of Gannon and Roach to investigate Way's claims. Way told him of the numerous discriminatory and retaliatory actions Iyamu subjected her to and specifically informed him that Iyamu's actions and behavior made her feel so uncomfortable that Way was afraid to take full days of medical leave for her anxiety. Nothing was done to remedy the situation.

27. In April 2020, Way took emergency sick leave after contracting COVID-19.

28. Missouri City attempted to misclassify Way's leave as regular FMLA as opposed to Emergency Paid Sick Leave. Improperly classifying the leave would have resulted in lost pay in accordance with the law then in place.

29. The City was taking actions that would discourage an employee from availing themselves of the leave that they are legally protected in taking.

30. In June 2020, Way learned that she needed surgery to have fibroids removed. Way informed Iyamu and Russell of the surgery. Way further advised them via email that she would have related doctors' appointments leading up to the surgery.

31. On June 11, 2020, Way had a doctor's appointment.

32. Iyamu was aware of Way's appointment because Way emailed Iyamu and Russell the details of the appointment.

33. However, while Way was out for her appointment, Fire Chief Eugene Campbell contacted Way. Chief Campbell asked that Way assist him in drafting an agenda cover memorandum. Way told him that she would not be able to assist him until after she arrived back at the office around 3:00 p.m. Chief Campbell then contacted Iyamu requesting assistance.

34. Again, Iyamu made it clear that she was not pleased with Way's medical absence. Iyamu contacted Way and told her, "The work day ends at 5 pm. Consider taking leave for the day. Feel free to just take 4 hours leave to account of the P&Z meeting last night." Again, the workday rarely ended at 5:00 p.m., as Way regularly work late hours. In fact the P&Z meeting the prior night, as referenced by Iyamu, had ended a little after 8:30 p.m.

35. On June 15, 2020, Way submitted completed FMLA paperwork to Russell, as well as a request for a reasonable accommodation in the form of working a flex schedule due to Way's doctor's appointments.

36. When Way's accommodations paperwork and FMLA documentation was forwarded to Iyamu, Iyamu responded by accusing Way of not performing her job duties.

37. Specifically, Iyamu referenced the June 11, 2020 matter involving Chief Campbell. Despite

knowing that Way had been out that day for a doctor's appointment, Iyamu used Way's medical related absence against her.

38. On July 1, 2020, Way contacted Russell about documentation of the approval of her accommodations request and FMLA leave. Instead of responding, Russell only forwarded an edited version of Iyamu's response to Way's request. No terms for flexing Way's schedule were established, nor did any interactive dialogue begin. . Additionally, the City never gave Way anything approving or denying the FMLA.

39. On July 1, 2020, when Way specifically noted on her calendar that she would flex her schedule by coming in from 1:00 p.m. to 8:00 p.m., Iyamu called Way and told her that she did not want Way to flex that late, stating that no client-department is in the office at that time.

40. However, their team regularly worked past 8:00 p.m. and on weekends, without a client-department in the building. Limiting the hours that Way could flex, resulted in Way having to take more leave time than needed.

41. Iyamu even started limiting her communications with Way, as well as Way's ability to communicate with other staff members.

42. For example, Way was asked to create a program per a new ordinance, but she was not allowed to communicate with the sponsor of the ordinance. Way had to use Iyamu as a middleman.

43. Also, when Iyamu was out of the office, she would not tell Way. Despite the fact that Way was her deputy and First Assistant, Way learned of Iyamu's absences only by getting an out of office reply that directed Way to another attorney in the office.

44. In the past Iyamu would name Way as the point of contact in her absence, which was appropriate as she was the First Assistant City Attorney.

45. In October 2020, Way learned that she would need surgery to have her cervix, uterus, and

fallopian tubes removed. Way informed Iyamu and Russell of the surgery and took FMLA leave.

**D. City Attorney Iyamu continued to assign Way work while she was on FMLA leave.**

46. In violation of the law, Iyamu allowed matters to still be assigned to Way while Way was out on leave. Additionally, Way was being contacted regarding ongoing projects.

47. Iyamu received communications forwarded from Way and Director of Communications Stacie Walker, but despite knowing that Way was out on federally-protected leave and under the law was not to work while on that leave, Iyamu failed to respond to the inquiries she had been forwarded.

48. On information and belief, Iyamu allowed work to be assigned to Way and failed to respond to inquiries while Way was on FMLA leave, to make Way look negligent in her duties.

49. Following Way's return to work, on December 17, 2020, Way learned that she would need an additional four days of FMLA leave for an unexpected medical procedure. Way informed Iyamu of her need for additional leave and still had federally-protected leave available for her to take.

50. On December18, 2020, Way learned that her FMLA leave was being improperly classified as "administrative leave."

51. The change in the classification of Way's leave was done after the City had approved her leave as FMLA leave, and only after she had taken the initial portion of her available leave and had requested more.

52. Administrative leave sends a message that is different from medical leave, it sends the message that Way had done something wrong. Administrative leave is what is given to employees that are involved in some type of discipline or investigation.

53. Way complained to City Manager Odis Jones about the improper coding and processing of her FMLA leave and about all of the discriminatory treatment she experienced, and expressed her desire to go to the EEOC.

54. In taking these actions, the City was engaging in conduct that would dissuade a reasonable person from availing themselves of federally-protected leave, as a government employee would not want their employment record – which is subject to disclosure – to reflect information that could reflect poorly upon them or cast them in a bad light when they may not have an opportunity to address assumptions that can be gleaned from an inaccurate employment file.

**E. City Attorney E. Joyce Iyamu and the City, behind closed doors began to plot its termination of Way's employment.**

55. On or about January 11, 2021, after Way's reasonable accommodations, her subsequent FMLA leave, her complaints regarding the City's retaliatory conduct, improper notice, improper documentation and calculations regarding her leave – the City Council agenda suddenly stated:

> "Consideration and possible action on eliminating the first assistant city attorney position in the City Attorney's Office for budgeting purposes and directing the city manager to submit a related budget amendment."

56. This was the first time such an item appeared on the agenda. This was not even done during the regular budget review, which had been done around September 2020. This was a sudden "budget" change to target Way's position. In fact, the only way the budget can be amended is through an ordinance, but this action was so swift and irregular that there was no ordinance proposed to make this change.

57. The motion was passed with no presentation or discussion. However, there was an excited utterance just before the motion passed. Councilmember Boney, stated – what was obvious – that councilmembers present for the vote had previously been together before the vote and had

discussed the matter in an executive session. No other words were spoken.

58. On January 13, 2021, Way asked City Manager Odis Jones what was going on with her position.

59. Jones stated that the council decided to terminate it and that they would have an attorney reach out to her. Way asked him when they decided this. He replied, "Last week."

60. On January 19, 2021, Attorney William S. Helfand of Lewis Brisbois and Russell arrived at Way's office around 11:00 a.m. Way was handed a letter and job description.

61. The letter alleged that the city attorney told the city manager in August of 2019 that the First Assistant City Attorney position was not a good use of city resources. Way was then told that her position was immediately terminated and that there was another job that Way could *apply* for when it became available.

62. Russell then told Way to gather her things.

63. Russell watched Way the entire time and told her not to take any papers because they needed to go through them.

64. In the midst of packing up her things, after being ordered to gather her stuff and leave, Russell asked if Way was going to take the job. Helfand also inquired as to whether Way was going to take the job.

65. Way stated that she needed to think about it because they caught her off guard. Way had just been told that she was being immediately terminated and to gather her things; Way hadn't been given an opportunity to review or consider anything; and had just been told she could *apply* for the job when it became available.

66. Aside from being told she could *apply* for the job when it became available, there is further evidence that there was no job offer and the City had no intention of Way working for the City

in the future.

67. First, Helfand and Russell escorted Way to her car and took her badge, as an employer would do when an employee is terminated.

68. Second, Way's termination was quickly announced to others. After Way had been given notice of the alleged "elimination" of her position, Parks and Recreations Director Jason Mangum publicly announced to his team, that Way was no longer an employee of the City. This announcement was made even before Way would have had an opportunity to decide if she would apply for another position to be created in the future.

69. Third, an email was sent that Way, effective immediately no longer worked for the City.



70. The manner in which Way was told of the "elimination" of her position and another alleged role, was not the way that Sade Dorton-McCallan was told of the elimination of her position and an alternative role.

71. Dorton was employed as the Tourism Manager. On or about January 5, 2021, Russell informed Dorton that her position was being eliminated and she was going to be offered an administrative position. Dorton was not immediately instructed to gather all her things, was not told to turn in her badge, was not immediately escorted from the property, and she was not told that she would have to apply for the other position. In fact, on or about January 20, 2021,

Dorton received an official job offer for a new position, just as she had been told she would, and without having applied.

72. Iyamu repeatedly showed disdain for the medical needs created by Way's disabilities and accommodation requests while discriminating against Way.

73. Way complained of the discrimination to Iyamu, Russell, Jones, and even Mayor Yolonda Ford. Nothing was ever done to address Way's complaints and concerns.

74. Way's disability, need for reasonable accommodations, use of FMLA leave, and complaints regarding the city's failures to comply with the ADA and the FMLA made her a target.

75. The City alleges that in August 2019, the city attorney told the city manager that the First Assistant City Attorney position was not a good use of city resources.

76. However, a budget including the First City Attorney position was subsequently presented in the 2019 and approved for the 2020.

FY 2020 ADOPTED BUDGET

POSITION HISTORY

| AUTHORIZED FULL-TIME POSITIONS | FY 18 ACTUAL | FY 19 BUDGET | FY 20 ADOPTED | INCREASE/ (DECREASE) |
|---|---|---|---|---|
| **FULL-TIME** | | | | |
| City Attorney | 1.00 | 1.00 | 1.00 | 0.00 |
| First Assistant City Attorney | 1.00 | 1.00 | 1.00 | 0.00 |
| Assistant City Attorney | 2.00 | 2.00 | 2.00 | 0.00 |
| TOTAL AUTHORIZED FULL-TIME POSITIONS | 4.00 | 4.00 | 4.00 | 0.00 |

| OBJECT CLASSIFICATION | FY 2019 ACTUAL | FY 2020 REVISED BUDGET | FY 2020 ESTIMATE | FY 2021 BUDGET |
|---|---|---|---|---|
| 51 - PERSONNEL COSTS | $ 552,698 | $ 561,908 | $ 566,507 | $ 557,167 |
| 52 - SUPPLIES & MATERIALS | 2,255 | 14,351 | 12,821 | 4,300 |
| 53 - PROF/CONTRACT SERVIC | 37,969 | 71,260 | 70,460 | 71,260 |
| 56 - OTHER EXPENDITURES | 17,722 | 34,043 | 33,635 | 35,706 |
| **TOTAL EXPENDITURES** | $ 610,643 | $ 681,562 | $ 683,423 | $ 668,433 |

77. Then, again in 2020, a budget including the First City Attorney position was subsequently presented and approved for 2021.

POSITION HISTORY

| AUTHORIZED FULL-TIME POSITIONS | FY 2019 ACTUAL | FY 2020 REVISED BUDGET | FY 2021 BUDGET | INCREASE/ (DECREASE) |
|---|---|---|---|---|
| CITY ATTORNEY | 1.00 | 1.00 | 1.00 | 0.00 |
| FIRST ASSISTANT CITY ATTORNEY | 1.00 | 1.00 | 1.00 | 0.00 |
| ASSISTANT CITY ATTORNEY | 2.00 | 2.00 | 2.00 | 0.00 |
| TOTAL AUTHORIZED FULL-TIME POSITIONS | 4.00 | 4.00 | 4.00 | 0.00 |

| FY 2020 DEPARTMENTAL GOALS | STRATEGIC PLANS OR PRIORITIES SUPPORTED BY GOAL |
|---|---|
| 1. Establish internal training recommendations for all staff and council | Strategic Plan Element |

https://www.missouricitytx.gov/ArchiveCenter/ViewFile/Item/612

78. It was not until after Way's requests for accommodations and FMLA leave that a motion for a budget amendment to change the name of Way's position arose and Way was terminated.

79. In February 2021, when an actual ordinance to amend the budget was presented, the position of First Assistant City Attorney was not even mentioned. The ordinance with the budget amendment added a position to the City Attorney's Office and attempted to increase the funds to the City Attorney's Office. A note was provided in the ordinance that stated that the position's description would be updated with the new budget; however, the actual position was not established. This is supported by the fact that the Council considered new salary classifications in May of 2021, which still included the position of First Assistant City Attorney.

80. It was not until the 2022 proposed budget, which was approved in October 2021, that Way's position of Fist Assistant City Attorney was eliminated.

FY 2022 ADOPTED BUDGET

**POSITION HISTORY**

| AUTHORIZED FULL-TIME POSITIONS | FY 2020 ACTUAL | FY 2021 REVISED BUDGET | FY 2022 ADOPTED BUDGET | INCREASE/ (DECREASE) |
|---|---|---|---|---|
| **LEGAL** | | | | |
| CITY ATTORNEY | 1.00 | 1.00 | 1.00 | 0.00 |
| FIRST ASSISTANT CITY ATTORNEY | 1.00 | 1.00 | 0.00 | (1.00) |
| ASSISTANT CITY ATTORNEY | 2.00 | 2.00 | 2.00 | 0.00 |
| JR AA CITY ATTORNEY | 0.00 | 2.00 | 3.00 | 1.00 |
| OFFICE MANAGER | 0.00 | 0.00 | 1.00 | 1.00 |
| **LEGAL TOTAL** | **4.00** | **6.00** | **7.00** | **1.00** |

**Explanation of Increase/Decrease in Positions:** The Office Manager's position was transferred from the City Manager Office to the Legal Department since the nature of the work for the position was legal related.

https://www.missouricitytx.gov/ArchiveCenter/ViewFile/Item/647

81. Missouri City's alleged reason for terminating Way was false. Her position had not been eliminated and had in fact been included in the approved budget for 2021 and there was no amendment subsequently changing that aspect of the budget.

**F. The City has a history of disfavoring employees that need accommodations and/or take medical leave.**

82. In or around October 2020, an employee, as part of Human Resources, was instructed to return to work in the office after having worked from home for a year due to the pandemic. At the time, the employee was pregnant and ordered by her doctor to stay home due to immunocompromised state as a result of pregnancy and her history of preterm delivery, making her a high-risk pregnancy. The employee sought the accommodation of continuing to work from home. The employee did not get a response back from Russell until sometime in March of 2021. At that point, the employee only needed approximately four more weeks of an accommodation, as she had a Cesarean section scheduled for April 4, 2021. When the request was put to Iyamu, Iyamu denied the request and the employee was told she could work in an office with the door closed. Yet, that would still have put the employee at risk of coming into contact with others and thereby risking her and her baby's health. Legal/Iyamu would not explain why the request was unreasonable, especially given that the employee had successfully completed the job from home and even had a good performance evaluation while doing so. The ultimatum forced the employee to begin her maternity leave four weeks before her due date, despite her continued ability to work from home had she been allowed to do so.

83. Now, as recently as September 7, 2021, during a special city council meeting, records reflect discontent with the fact that the Court Director Brittany Rychlik was unavailable due to being out on medical leave.

**G. Way's disabilities limit major life activities, which include major bodily functions.**

84. Way's uterine fibroids, and subsequent hysterectomy, significantly limited major life activities. Additionally, have affected major bodily functions.

85. Way's fibroids resulted in heavy uterine bleeding and required frequent trips to the bathroom,

and even significant pain, which created limitations on Way's ability to care for herself, while also disrupting her sleep and work. With the fibroid came increased urination, which had a significant effect on Way's bladder. When the condition worsened, it also resulted in anemia, where she had to seek the care of others. For instance, she had to be treated with iron infusions and be treated by hematologist.

86. Due to the treatments Way received for the fibroids there was significant scarring, which resulted in her uterine tubes being blocked. Way could not (and cannot) get pregnant naturally. The fibroids resulted in significant and permanent impairment of Way's reproductive functions.

87. Way's submucosal fibroids bulge into the uterine cavity preventing pregnancy needed to be removed. Each surgery to remove fibroids would reduce ovarian reserve, so IVF commenced prior to Way's surgery. During treatment, Way experienced bloating and extreme pain. As further evidence of Way's reproductive limitations, even prior to the hysterectomy, there was a hydrosalpinx at Way's right fallopian tube and no eggs could be retrieved.

88. Way's fibroid was removed around July 24, 2020, this resulted in Way being extremely tired and caused significant pain, with the fibroid having an extremely rare pathology.

89. Ultimately, Way's disability, required a hysterectomy, with the removal of Way's uterus, fallopian tubes, cervix, and right ovary to reduce the risk of cancer. Only a fraction of Way's left tube remains.

90. Following the hysterectomy, Way required another surgery on December 29, 2020. She required surgery to repair open incisions from her hysterectomy. Despite the surgery Way still experienced limitation, where she could not lift anything heavy while trying to heal. In fact, on the day of her termination, January 19, 2021, Martin Russell carried Way's bag to her car.

91. For the next five years Way will be screened a minimum of twice a year for signs of the tumors returning.

92. Way's reproductive functions were substantially limited and will forever be substantially limited. Way can no longer carry a child and the chances of egg retrieval is very slim, as what remains of her reproductive organs barely functions.

93. Of the portion of the fallopian tube remaining on the left ovary, Way still experiences significant pain that affects her day-to-day life and requires surveillance and frequent trips to the doctor.

94. Way's anxiety causes her thoughts to race and affects her ability to think and concentrate. Fear of failure causes Way to become fixated on tasks.

95. When there is a lack of clear policies or predetermined standards, such as those encountered with Missouri City, Way experiences an increase in fear racing thoughts affecting her concentration. This also resulted in an inability to sleep and eat. Way's appetite did not return until she antianxiety medication.

96. Way also experienced muscle tension and tightness resulting from the anxiety, in the past the pain increased to the point of having to close the door to her office to lay on the floor.

97. Further affecting her ability to work would be anxiety induced pelvic floor spasms, for which Way has gone to the hospital twice.

### III. CONDITIONS PRECEDENT

98. Way timely dual-filed charges of discrimination with the U.S. Equal Employment Opportunity Commission and the Texas Workforce Commission – Civil Rights Division.

99. Way files this complaint within 90 days of receiving notice of her right to sue from the EEOC.

100. All conditions precedent to filing suit have been satisfied or fulfilled.

## IV. DISCRIMINATION IN VIOLATION OF THE ADAAA

101. Way re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

102. Defendants' actions, including but not limited to its decision to terminate Way, the failure to reasonably accommodate Way, and the later interference with her accommodations, were undertaken because of her disabilities. These actions constitute violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.*, as amended ("ADAAA").

103. To redress the injuries sustained by Way on account of these discriminatory actions, she has retained the undersigned counsel to represent her in this action. She therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

104. Additionally, Way seeks any and all economic damages, including but not limited to, lost wages, back pay, front pay, and other employment benefits, and equitable and injunctive relief necessary to return her to the position that she would have been in but for Defendants' unlawful discrimination.

## V. RETALIATION IN VIOLATION OF THE ADAAA

105. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

106. Defendants' actions as described herein constitute unlawful retaliation on the basis of Plaintiff's protected activities of seeking reasonable accommodations and complaining of discrimination. These actions constitute violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.*, as amended ("ADAAA").

107. To redress the injuries sustained by Way on account of Defendants' discriminatory actions, she has retained the undersigned counsel to represent her in this action. She therefore seeks

recovery of reasonable attorneys' fees, experts' fees, and costs.

108. Additionally, Way seeks any and all economic damages, including but not limited to, lost wages, back pay, front pay, and other employment benefits, and equitable and injunctive relief necessary to return her to the position that she would have been in but for Defendants' unlawful discrimination.

## VI. INTERFERENCE WITH RIGHTS IN VIOLATION OF THE FMLA

109. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

110. Plaintiff was an eligible employee as defined by the FMLA 29 U.S.C. §2611.

111. Defendants actions violating the FMLA include but are not limited to interference with Plaintiff's rights pursuant to the FMLA.

112. Defendants discriminated or otherwise retaliated against Plaintiff in violation of the FMLA.

113. Defendants' actions as described above constitute unlawful denial of and/or interference with Plaintiff's attempts to exercise her rights under the FMLA, in violation of 29 U.S.C. § 2615.

114. To redress the injuries sustained by Way on account of Defendants' discriminatory actions, she has retained the undersigned counsel to represent her in this action. She therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

115. Additionally, Way seeks any and all economic damages, including but not limited to, lost wages, back pay, front pay, and other employment benefits, and equitable and injunctive relief necessary to return her to the position that she would have been in but for Defendants' unlawful interference with her FMLA rights.

## VII. RETALIATION IN VIOLATION OF THE FMLA

116. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

117. Defendants' actions constitute unlawful retaliation on the basis of Way's protected activity of applying for and taking FMLA leave, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

118. The employment practices complained of above were intentional.

119. Defendants subjected Way to adverse employment actions because of her engagement in protected activities, including terminating her employment.

120. To redress the injuries sustained by Way on account of Defendants' discriminatory actions, she has retained the undersigned counsel to represent her in this action. She therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

121. Additionally, Way seeks any and all economic damages, including but not limited to, lost wages, back pay, front pay, and other employment benefits, and equitable and injunctive relief necessary to return her to the position that she would have been in but for Defendants' unlawful retaliation.

## VIII. DISCRIMINATION AND RETALIATION IN VIOLATION OF THE TCHRA

122. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

123. Defendants' actions, including but not limited to its decision to terminate Way, the failure to reasonably accommodate Way, and the later interference with her accommodations, were undertaken because of her disabilities and need for reasonable accommodations. These actions constitute violations of the Texas Commission on Human Rights Act.

124. To redress the injuries sustained by Way on account of these discriminatory and retaliatory actions, she has retained the undersigned counsel to represent her in this action. She therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

125. Additionally, Way seeks any and all economic damages, including but not limited to, lost wages, back pay, front pay, and other employment benefits, and equitable and injunctive relief necessary to return her to the position that she would have been in but for Defendants' unlawful discrimination and retaliation.

## IX. <u>JURY DEMAND</u>

126. Plaintiff hereby makes a demand for a trial by jury on all issues, claims, and defenses in this action.

## X. <u>PRAYER</u>

127. WHEREFORE, Plaintiff Jamilah Way respectfully requests that the above-named Defendants be cited to appear in this matter and that, after jury trial by proof, she be awarded:

   A. All economic damages, including but not limited to, lost wages, back pay, front pay, and other employment benefits;

   B. All noneconomic damages, including but not limited to, compensatory damages for mental anguish, emotional distress, and loss of enjoyment of life;

   C. Reinstatement to Plaintiff's position of employment, equivalent position of employment, or the position of employment Plaintiff would have enjoyed but for the discrimination, retaliation, and other illegal acts;

   D. Judgment against Defendants for Plaintiff's reasonable attorneys' fees, and costs of suit;

E. Prejudgment and post-judgment interest as allowed by law; and

F. Such other and further equitable relief to which Plaintiff may be justly entitled, as this Court may deem proper.

Respectfully submitted,
Wiley Wheeler, P.C.

By: /s/ Kalandra N. Wheeler
Kalandra N. Wheeler* (Attorney-In-Charge)
Texas Bar No. 24051512
Robert J. Wiley*
Texas Bar No. 24013750
*Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*

WILEY WHEELER, P.C.
1651 Richmond Avenue
Houston, Texas 77006
Telephone: (713) 337-1333
Facsimile: (713) 337-1334
kwheeler@wiley-wheeler.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of April, 2023, I filed the foregoing with the Clerk of the Court for the U.S. District Court, Southern District of Texas, Houston Division, which is also being served on counsel for Defendant, via the Court's EFC system.

/s/ Kalandra N. Wheeler
Kalandra N. Wheeler